[No. 15164-6-III. Division Three. June 12, 1997.]

THE STATE OF WASHINGTON, *Respondent*, v. TIMOTHY L. SOMMERVILLE, *Appellant*.

*Louis D. Fessler* and *Hugh M. Spall, Jr.,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Bruce Hanify, Deputy,* for respondent.

KURTZ, J. — Timothy L. Sommerville appeals the denial of his petition for conditional release from Eastern State Hospital contending the court erred (1) by finding the State produced substantial evidence Mr. Sommerville continues to suffer from a mental illness; (2) by finding the State produced substantial evidence Mr. Sommerville presents a substantial danger to the community; and (3) by upholding the constitutionality of RCW 10.77.150(2). We reverse.

## FACTS

On November 24, 1985, Timothy Sommerville killed his wife and raped his 16-year-old stepdaughter. At the time of the act, Mr. Sommerville was 38 years old and had been married to Crystal Sommerville for almost three years. He lived in Selah with his wife and two stepdaughters. He enjoyed fairly normal relationships with his wife and stepchildren, and he did not sexually or physically abuse them prior to the crime.

On the night of the incident, the 16-year-old stepdaughter left with friends to go to a school dance with her parents' permission. Mr. Sommerville and his wife ate dinner, watched television and retired to bed. At about 1:30 A.M., Mr. Sommerville was awakened by a telephone call from his stepdaughter requesting a ride home because her arranged transportation had failed. He complied with the request and was neither upset about the hour nor the situation. Upon returning home, Mr. Sommerville returned to his bed.

Approximately one-half hour later, Mr. Sommerville awakened and got dressed. He went into the living room, picked up a baseball bat and returned to the bedroom. He struck his sleeping wife three times in the head, causing her near-instant death. He then went into the bathroom and washed the blood off the bat. Subsequently, Mr. Sommerville described his state of mind at the time as if " 'he was watching TV.' " He further described it was as if " 'I was watching me do it' " and " 'It didn't feel like anything I could stop.' "

Next Mr. Sommerville went upstairs to his 16-year-old stepdaughter's room and awakened her. He demanded to have sexual intercourse with her. After her repeated refusals, he put a knife to her throat. He then forced her to have oral sex with him. Thereafter, he attempted to have vaginal intercourse with his stepdaughter. She told him she was a virgin and based upon her pleas, he attempted anal intercourse. Finding penetration impossible, he took her downstairs and obtained a lubricant. He then took her back upstairs to her bedroom and accomplished anal intercourse. It was at this point, Mr. Sommerville reported, he came to his senses. Soon afterwards, he called the Yakima Sheriff's Office and was arrested.

On April 21, 1986, Mr. Sommerville was adjudged as suffering from a mental disease or defect known as a dissociative reaction or depersonalized state and as a result, he was acquitted of the murder by reason of insanity. However, the judge found the testimony regarding Mr.

Sommerville's sanity as to the rape charge conflicting and, consequently, he was tried for first degree rape. Mr. Sommerville was convicted and sentenced. The insanity acquittal for the murder and the rape conviction were both upheld on appeal. *State v. Sommerville*, 111 Wn.2d 524, 760 P.2d 932 (1988).[1]

Pursuant to RCW 10.77.140, Eastern State Hospital was required to make semiannual reports to the court regarding Mr. Sommerville's mental condition. In the first report dated May 23, 1989, Mr. Sommerville's diagnosis was depersonalization and isolated explosive disorder. Significantly, Eastern reported his current condition and symptoms were not consistent with the diagnostic criteria for that mental illness. Over the years, this lack of symptoms is consistent throughout the reports from the hospital. For example, in July 1990, Eastern reported:

> The treatment team, in reviewing Mr. Sommerville, concludes that there is insufficient information indicating he will not be a danger to the community if released. This is based on the unpredictability and lack of clear motive surrounding the crime leading to hospitalization. It is also based on our inability to presently detect psychopathology. The result being, we have no measure of improvement except for the amount of time he has been stable. This puts us in the position of opting for more observation time until such a day arrives that we can either observe something that can be aggressively treated or feel comfortable that enough time has elapsed without major incident to pursue discharge.

Mr. Sommerville was detained, but continued to show no symptoms.

---

[1]The trial court sentenced Mr. Sommerville to 68 months for the rape conviction and ordered him to serve his sentence on the rape conviction before being handed over to the custody of the Department of Social and Health Services (DSHS) to serve his criminal commitment on the homicide charge. This judgment was reversed by the Washington State Supreme Court, which held that an insanity acquittee could not be incarcerated in a state correctional institution or facility. Therefore, the appellate court ordered Mr. Sommerville remanded to the custody of DSHS until final discharge pursuant to RCW 10.77.200, thereafter to be remanded to the custody of the Department of Corrections to serve his sentence for first degree rape.

In a report to the court dated October 8, 1992, Eastern abandoned its depersonalization and isolated explosive disorder diagnosis. The report stated:

> Since his admission, he has shown no sign of mental illness and has shown no sign of being dangerous to anyone on ward or around his treatment process . . . . Based on his lack of history of mental illness prior to this crime and commitment, no evidence of mental illness during this admission, and his lack of documented violent acts since the crime in 1986 [sic], he appears to have reached a status of maximum benefit of any treatment that this hospital may provide.

As a result of this determination, the State and Mr. Sommerville entered an Agreed Order Granting Conditional Release on February 4, 1993, wherein Mr. Sommerville was released to the Department of Corrections to complete his rape sentence.

Upon completion of his rape sentence, Mr. Sommerville was returned to Eastern on February 2, 1994. In the March 7, 1994, report to the court Mr. Sommerville's diagnosis was "Impulse Control Disorder, Not Otherwise Specified, in Partial Remission; Depersonalization Disorder by History; and Alcohol Abuse by History." When asked at a subsequent hearing to explain why Mr. Sommerville's diagnosis of serious mental illness was reinstated, the doctor who wrote the report stated:

> [M]y decision was to put the diagnosis back because we need to identify what brought the patient to the hospital. And we need to understand what kind of treatment modalities are needed to see and evaluate and assess on a daily basis.

He further testified the "partial remission" designation meant the "potentiality's still there based on his past record or past background, history." Shortly after this report, Mr. Sommerville submitted a handwritten petition for conditional release.

On June 8, 1994, Eastern requested an expert sexual offender evaluation be ordered for Mr. Sommerville to enable Eastern to make a recommendation regarding a

conditional release. The Eastern team felt the evaluation was necessary because they believed the murder and rape should both be considered together when predicting future dangerousness and thus the appropriateness of conditional release. After consulting with his attorney, Mr. Sommerville declined to participate in the sexual offender evaluation for the reason that he had completely served his criminal sentence for the rape conviction.

On August 23, 1995, an evidentiary hearing was held regarding Mr. Sommerville's conditional release petition. Dr. Dennis Sheppard, a psychologist, testified on behalf of Mr. Sommerville after reviewing his records. Dr. Sheppard testified Mr. Sommerville did not have the manifestations of a diagnosable mental disorder. He also testified he disagreed with Mr. Sommerville's diagnosis indicating the impulse control disorder was in "partial remission" because it implied the presence of some criteria of the disorder when in fact none was present. Dr. Sheppard also testified that given the conditions Mr. Sommerville requested for release, he could be released without presenting a substantial danger to the community. Finally, Dr. Sheppard testified a sexual offender evaluation does not help predict future dangerousness, but rather is a tool for treatment.

Two doctors from Mr. Sommerville's treatment team at Eastern testified: Dr. Dodds Simangan, a psychiatrist, and Dr. Thomas Saltrup, a psychologist. Dr. Simangan testified Eastern could not certify Mr. Sommerville's lack of dangerousness and thus could not recommend release until a sexual offender evaluation was conducted. He stated that it was his decision to reinstate the depersonalization disorder diagnosis in remission, although he conceded Mr. Sommerville did not currently exhibit any symptoms of mental illness. When asked whether a sexual offender evaluation would be useful for a prediction of dangerousness, he equivocated, stating "it's more of a treatment approach." Finally, Dr. Simangan testified if the issue of the sexual offender evaluation was not pres-

ent, Mr. Sommerville would be a reasonable risk for conditional release.

Dr. Saltrup testified Mr. Sommerville has displayed "very positive" daily behaviors, with appropriate affect, well-managed anger impulses, and no assaultive behavior. Dr. Saltrup also testified Mr. Sommerville exhibited "no acute symptoms" of a mental disorder. However, Dr. Saltrup testified that because he was concerned about the nature of the sexual assault crime, he was requesting the sexual offender evaluation.

The court denied Mr. Sommerville's petition for conditional release. The court found Mr. Sommerville "does not presently show symptoms of the mental defect which existed at the time of the homicide." The court also found all the experts who have evaluated Mr. Sommerville over the years conclude little information is known about his type of mental disorder and his behavior did not clearly fit the recognized diagnostic criteria. The court stated:

> [T]here is substantial evidence that the petitioner still suffers from a mental illness, although he does not presently exhibit symptoms of it. In fact, periodic remission of symptomology is part of the description of his mental illness as the court understands it.

Additionally, the court found the State produced substantial evidence Mr. Sommerville could not be released without substantial danger to other persons or substantial likelihood of committing felonious acts jeopardizing public safety or security. The substantial evidence cited by the court was (a) the rape behavior should now be evaluated and treated before there can be a relatively safe conditional release order; (b) Mr. Sommerville's childhood history of his own rape and the molestation of a younger relative is highly relevant to assessing his risk to the community safety particularly given his explosively violent behavior in November 1985; and (c) Mr. Sommerville

has resisted therapeutic intervention and thus precluded treatment relating to the rape.

## ANALYSIS

 *Standard of Review.* Where the State opposes an application for conditional release, it must introduce substantial evidence the petitioner poses a danger to the public. *State v. Paul*, 64 Wn. App. 801, 805, 828 P.2d 594 (1992). Substantial evidence is described as evidence sufficient to persuade a fair-minded person of the truth of the declared premise. *State v. Sommerville*, 111 Wn.2d 524, 533-34, 760 P.2d 932 (1988). The trial court then weighs the evidence to determine which party's evidence it reasonably finds to be more credible, in other words, which evidence preponderates. *Paul*, 64 Wn. App. at 807. Moreover, on review deference is given to the trier of fact who "resolves conflicting testimony, evaluates the credibility of witnesses and generally weighs the persuasiveness of the evidence." *State v. Walton*, 64 Wn. App. 410, 416, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992).

*Statutory Scheme.* RCW 10.77.150 governs petitions for conditional release of insanity acquittees. Such an individual may apply for release and, after considering the experts' reports, the Secretary of the Department of Social and Health Services shall make a recommendation. The court may schedule a hearing on applications recommended for disapproval by the Secretary and the standard for conditional release is stated as follows:

> The issue to be determined at such a hearing is whether or not the person may be released conditionally without substantial danger to other persons, or substantial likelihood of committing felonious acts jeopardizing public safety or security.

RCW 10.77.150(2). The standard for final discharge of an insanity acquittee is stated in RCW 10.77.200(2) as follows:

> The burden of proof shall be upon the petitioner to show by a

preponderance of the evidence that the petitioner no longer presents, *as a result of mental disease or defect*, a substantial danger to other persons, or a substantial likelihood of committing felonious acts jeopardizing public safety or security, unless kept under further control by the court or other persons or institutions.

(Emphasis added.) The standard for a conditional release and a final release are different. Unlike RCW 10.77.200(2), RCW 10.77.150(2) does not require a causal connection between dangerousness and the mental illness. But the differences are resolved by RCW 10.77.200(3):

Nothing contained in this chapter shall prohibit the patient from petitioning the court *for final discharge or conditional release* from the institution in which he or she is committed. The issue to be determined on such proceeding is whether the petitioner, as a result of a mental disease or defect, is a substantial danger to other persons, or presents a substantial likelihood of committing felonious acts jeopardizing public safety or security . . . .

(Emphasis added.) "Statutes touching upon the same subject are to be interpreted harmoniously." *Vashon Island Comm. for Self-Gov't v. State Boundary Review Bd.*, 127 Wn.2d 759, 771-72, 903 P.2d 953 (1995). Both RCW 10.77.150(2) and RCW 10.77.200(3) set out the legal standard for conditional release. Accordingly, we conclude the trial court must find that the petitioner, as a result of a mental disease or defect, is a substantial danger to other persons or presents a substantial likelihood of committing felonious acts jeopardizing public safety or security.

Our reading is also consistent with the definition of a "criminally insane" person as:

[A]ny person who has been acquitted of a crime charged by reason of insanity, *and thereupon found to be a substantial danger* to other persons or to present a substantial likelihood of committing felonious acts jeopardizing public safety or security unless kept under further control . . . .

RCW 10.77.010(1) (emphasis added).

Finally, continued confinement based on a finding of dangerousness alone would violate the equal protection clause of the United States Constitution. *Foucha v. Louisiana*, 504 U.S. 71, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). In *Foucha*, a plurality of the court struck a Louisiana statute regarding the release of criminal defendants found not guilty by reason of insanity because it placed the burden of proving lack of dangerousness on the petitioner and because it authorized confinement based solely on dangerousness. In that case, Mr. Foucha's doctors reported there had been no evidence of mental illness since his admission and they recommended his conditional discharge. The State sought to continue Mr. Foucha's confinement based on his antisocial personality, which rendered him potentially dangerous to others. A plurality of the Court found this scheme violated due process. *Foucha*, 504 U.S. at 78-84.

*The Mental Illness Finding.* The court found substantial evidence exists Mr. Sommerville still suffers from a mental illness "although he does not presently exhibit symptoms of it. In fact, periodic remission of symptomology is part of the description of his mental illness as the court understands it." Dr. Sheppard testified, "I don't believe he has the manifestations of a current diagnosable mental disorder at this time." Ronald Rockwood, the forensic therapist, testified the only symptomology of the depersonalized state Mr. Sommerville ever exhibited was during the murder. Dr. Simangan also testified Mr. Sommerville shows no evidence of mental illness and that in "partial remission" means the "potentiality's still there based on his past record or past background, history." Similarly, Dr. Saltrup testified he has not seen any symptoms of mental illness exhibited by Mr. Sommerville.

Here, the court made a seemingly contradictory finding: Mr. Sommerville shows no symptoms, yet "substantial evidence" exists he suffers from a mental disorder. The court explained periodic remission of symptomology is part of the description of his mental illness. However, the evi-

dence indicates Mr. Sommerville has not experienced "periodic" remission—on the contrary, he has not experienced any of these symptoms since 1985. The testimony of all of the experts was that Mr. Sommerville shows no symptoms of mental illness. In fact, none of the experts positively asserted Mr. Sommerville currently suffers from a mental disorder or illness.

In *Levine v. Torvik*, 986 F.2d 1506 (6th Cir. 1993), the experts testified Mr. Levine's mental illness was "in remission" and gave a definition nearly identical to Dr. Simangan's definition of partial remission. The uncontroverted testimony in *Levine* was Mr. Levine had not exhibited symptoms of his illness since 1982, nor had he shown signs of dangerousness. *Levine*, 986 F.2d at 1513. The trial court found that because Mr. Levine suffered from psychosis "for which there is no known cure," he was still mentally ill and therefore dangerous. On appeal, the trial court's determination that Mr. Levine suffered from mental illness and was dangerous was overturned. The court noted in effect the trial court's reasoning amounted to "an irrebuttable presumption that Levine can *never* be released." *Levine*, 986 F.2d at 1514.

The trial court's reasoning reaches the same inevitable conclusion: Because Timothy Sommerville once exhibited symptoms of a mental disorder, he will always be deemed "mentally ill" regardless of his lack of symptoms because the disease may be in "periodic remission." An insanity acquittal will support an inference of continuing mental illness, but that inference does not last indefinitely. *United States v. Bilyk*, 29 F.3d 459, 462 (8th Cir. 1994). Otherwise, the periodic reports and subsequent hearings mandated by RCW 10.77 would be purposeless, as would the directive that the State must release the insanity acquittee when the basis for holding him or her in the psychiatric facility disappears. The evidence indicates Mr. Sommerville has not shown symptoms of any mental disorder since 1985. The court's finding that

Mr. Sommerville is currently suffering from a mental disorder is not supported by substantial evidence.

## HOLDING

Because the State failed to produce substantial evidence of continuing mental illness, the order denying Timothy Sommerville's petition for conditional release is reversed. The matter is remanded to the trial court for the entry of an order in conformity with this decision and so that the court, pursuant to RCW 10.77.150(2), may establish the terms and conditions on which Mr. Sommerville is to be conditionally released. To the extent it deems appropriate, the court may consider additional relevant evidence for that purpose. In view of this decision, other issues raised by Mr. Sommerville on appeal shall not be considered.

SWEENEY, C.J., and THOMPSON, J., concur.

Review denied at 133 Wn.2d 1023 (1997).